Let me tell you, we have a long, hard day today. We're going to be here well into the afternoon, so I beg you to stick by the time limits. You don't have to... None of you have to say, no, we reserve so many minutes of our time. We have a clock right there. Thank you, Your Honor. Okay, go ahead. Ashley Aul for the United States. May it please the Court. The District Court here wrongly concluded that this search was warrantless. And then, building error upon that error, went on to conclude that there was no good-faith analysis applicable to execution of the warrant, which is contrary to the Supreme Court's holding in Maryland v. Garrison, as well as this Court's holding in Sedegatti, and also that no protective sweep could take place absent a probable cause arrest. Each of these questions is subject to de novo review here. The District Court erred in each of those regards, and so the suppression order must be vacated. Starting with this, the scope of the warrant, the building searched by the officers here was within the scope of the warrant for one of two reasons or both. Either as a garage associated with T.U. Garcia's property, T.U. Garcia was the target of the warrant, or as part of his residence based on his own statement that it was part of his residence. And defendant's position has... Well, I think the District Court understood that the warrant says associated garages, but the question is whether it's still a garage upon entry into a structure that had so clearly been converted into a residence. How should we analyze that issue? It needs to be analyzed under the Hitchcock factors, Your Honor. And part of the error of defendant's position is to hinge his entire argument upon a dictionary definition of garage as a place currently suitable for cars to be stored. But under the Hitchcock factors, there are far more facts relevant to determining the scope of a warrant, and specifically far more facts that look to the particular circumstances of a case. And those facts entail analysis of what led to the issuance of the warrant, the text of the warrant itself, and what officers encountered when they executed the warrant. And here, the warrant was issued as part of a drug trafficking investigation, and it explains that drug traffickers store evidence of drug trafficking sometimes for long periods of time. Let me interrupt if I may. Actually, finish your answer to her question because I want to pick up on something. Go ahead. Absolutely, Your Honor. I apologize. No apology necessary. That they store evidence of drug trafficking throughout their residences, and it enumerates a few different places included in that definition, including garages, storage containers, vehicles. Let's get to the other Hitchcock factors, which I find to be much more problematic for this case. We know what the warrant says, and now the warrant says associated garage, right? And the government's position is, well, this is obviously a garage. A garage is a garage is a garage. But I think it's pretty arguable that this was not a garage, not functionally a garage. And I'm not talking about any term of art. It's just a commonsensical definition for reasonable person standard. I agree, Your Honor, that it's a reasonableness definition. The question really is can it reasonably be considered a garage? And I think that question does depend on the context of the warrant under Hitchcock. And the context of the warrant doesn't establish probable cause that a car is going to be found in a garage. What if this were a carriage house? A detached carriage house with a place for automobiles underneath and a premises above, living premises. Could they have searched those living premises under these circumstances? The problem that I have is what difference does it matter what it's called or how it's described? And the description is understandable. That's what it was at one point. It seems to me what matters is what it is. And they open the door. They see a sink, a microwave, a refrigerator, and a bathroom. And apparently, if I understand correctly, Mr. Robinson was in or coming out of the bathroom when, I mean, and then there was a partition and a hallway, two bedrooms. I think, Your Honor, what the question is is whether, and colloquially, to be honest, I would still refer to that as a garage. Sure. And no doubt that bias informs the position in this field. But it was a residence. It was a dwelling. But the question is when you get to the question of whether or not it was a residence, the question there is whether it was a separate residence, which does change standards that are applicable. And there is no evidence that it was a separate residence. The only evidence in the record is that it was part of T.U. Garcia's residence. It was occupied by people who had nothing so far as the officers knew to do with anything with what the warrant was all about. On the one hand, that's true. There was no reason to believe they were targets of the warrant. They have a reasonable expectation of privacy. Will you at least grant that much? Yes. Okay. But that goes to something that we've dealt with in the reply, which is that there is an important distinction between standing, which is the reasonable expectation of privacy, and that we have not contested here. But, you know, look, I'll tell you what bothers me. This was part of a raid, nine people in eight different houses, right? I mean, this just wasn't one little warrant that was served at one house. It was a joint operation, right? I believe that's correct, Your Honor. What do you mean you believe it's correct? I was not involved in the execution of the warrant. Oh, don't you read the briefs? Yeah. I believe that the warrants were executed. Joe, that there was a raid on eight different houses? The warrant was issued for, I believe, eight different houses. That's correct. Okay. So that's, now this, they were out there, they spent a month observing the house. Yes, Your Honor. And they could have looked into the property ownership records, building permits, water bills, electric bills. It's all online. Most of these are county records, L.A. records. And they could have seen that the garage had been converted from the building permit records. It was very easy, and it's not uncommon in that neighborhood, which is a poor neighborhood, for people to convert garages into livable quarters. So tell me what they did. Tell me what they did when they observed this garage for a month. Find out. There is a section of the warrant that deals with observing the property, and it simply indicates that. What did they do? It does not indicate there was any inquiry into records. We don't know what they did. But they did observe Garcia, who was the subject of the warrant, coming and going and parking his car in the driveway of the home. Well, if you get the pictures from the street, you can look straight into the property, and you can see what probably was a door to a garage was all nicely decorated and boarded up. To the question of property records, Your Honor, there was no inquiry to property records, but there's also no dispute that this was part of the drug trafficker's residence. But can you tell me what they did during the month they observed this house? There was no inquiry into whether there had been permits pulled for the garage. That's correct. Excuse me, Judge, I'm sorry. And he answered residence under what one would assume were very stressful circumstances. He also said, is that part of your home, whether it belongs to an attached duplex? He said, no, it's part of the residence. That seems to me to be a very weak straw to hang the contention that, therefore, they could simply ignore what was immediately apparent to them about the nature of what was inside the garage. And then moving to the protective sweep, if I understand correctly, the three persons who were in there in two bedrooms that we call the diagram, led into the passageway or right off where they were standing. You've got all three people accounted for. So even if there are firearms there, there's no reason to believe there's anybody else there. That's the other problem I have with this case. At the very least, even if they were there lawfully, once they ascertain the three people who are in the place as to whom they have no reason to suspect they're involved, I realize it's Mr. Garcia's son and his girlfriend or whatever, but they're secured. And I'm really troubled by the idea that somehow semantics trumped the Fourth Amendment. They had a right of privacy in that premises. As far as I'm concerned under the Fourth Amendment, whether you call it standing, reasonable expectation of privacy, or however you describe it, and that's my problem with your case. So as to the standing question, I would point Your Honor to the Ayers case, which we cited in the brief, which deals with, I think, meaningfully distinction between standing and a Fourth Amendment violation. As to the protective sweep, the issue there is that officers, though the declarations are laid out in excruciating detail that has a sort of expanding effect on time and makes this seem like it was a process by which people were carefully removed and then there was a sweep, it was all happening at the same time and very quickly. And so as a result, the officers didn't know if there was someone else there. They were told by Garcia that there was a renter that lived in that separate house. That's not true, Your Honor. Well, that's what the record shows. The record does not show that, Your Honor. That his son was living there. They knew before going in that it had been converted, essentially, into a residence. They did not know before going in. The only thing they knew before going in was what they saw from the outside, which the government submits was not sufficient. But you're saying Garcia didn't mention the fact that there was somebody living. He did not. He was asked whether it was part of his residence, and he said that it was. I'll double-check. I think he said that during the suppression hearing. So during the suppression hearing, months later, and I would note for the record in the little card that was filled out by officers interviewing Robinson at the time, Robinson being the defendant here. Let me answer this question. Once they kicked in the door, they knew they were moving into the place where people were living. Once they kicked the door, they knew there were people in there, people were living in there. Once they kicked the door in, they certainly saw that it had been finished with drywall. They realized it was not a garage. If they wanted to get a warrant, just pick up the phone. You can get a warrant over the telephone. It's very easy. Right? Yes, Your Honor. You know that you can do that. Yes. We have to respect people's dwelling quarters. Because that's in the Constitution. Absolutely, Your Honor. And when you get these raids like this, where they're out, big sweep, things like this happen. I see them well over my time. Can I ask one final question? The government didn't raise a curtilage argument, did it? No, we did not, Your Honor. Thank you, Your Honors. Okay. Thank you. Good morning, Your Worship. We're occurring on behalf of the… Just say good morning and thank you and sit down. That's what I was going to do. Okay, good. I was going to say good morning. Well, if I may just, because I want to follow up. And unfortunately, she ran out of time and didn't get to address it. On the curtilage issue, let's assume the garage is part of the curtilage. What difference does that make? It doesn't make any difference to me. I think you're all on the right path. This was a house. Once they opened that door… It was a residence, I think. …it became a residence. I think it may make a difference, but the government didn't argue it. No, the government didn't argue it. Factually, I think that issue is gone. That's what I had argued in my brief, that they did not argue that at the district level. And that's why we took such great pains to show the pictures to the district court, to have her see what the officers saw when the door opened. And so the only thing on the protective sweep, they may have been able to sweep that house, but it was so small, it's the size of a garage. What is that, 20 by 20? They got everybody, and the government keeps making an issue out of this rifle case. You have the pictures, I think, of all the pictures that were taken. There's a rifle case, and I was going to say, unless these officers have X-ray eyes, they don't know what's in there. They had to open that rifle case, which they weren't allowed to do. They may have had probable cause to believe that there was a rifle in there or a weapon. But they needed to get a warrant. Right. I mean, at least that's how I feel. It's kind of obvious. So all the guns need to be suppressed. All right. Thank you. Unless you have any questions? No. Thank you very much.
judges: Carr, Pregerson, Nguyen